Filed 12/18/23 Certified for Publication 12/29/23 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GREGORY GARRABRANTS, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHARLES MATTHEW ERHART, <br><br> Defendant and Appellant. | D080136, D081154 <br><br><br> (Super. Ct. No. 37-2017-00039440-CU-NP-CTL) |

CONSOLIDATED APPEALS from a judgment and post-judgment order of the Superior Court of San Diego County, Ronald F. Frazier, Judge. Reversed and remanded.

The Gillam Law Firm, Carol Gillam, Sara Heum; Pine Tillett, Norman Pine, and Scott Tillett for Defendant and Appellant.

Sheppard, Mullin, Richter & Hampton, Martin D. Katz, Polly Towill, Heather Plocky, and David M. Berger for Plaintiff and Respondent.

INTRODUCTION

Charles Matthew Erhart was an internal auditor at BofI Federal Bank (BofI) who "blew the whistle" on his employer. Erhart copied, transmitted to multiple regulatory authorities, and subsequently retained various

documents he believed evidenced possible wrongdoing, some of which contained the personal and confidential information of BofI's Chief Executive Officer (CEO), Gregory Garrabrants. Garrabrants sued Erhart for accessing, taking, and subsequently retaining his personal information. By special verdict, a jury awarded Garrabrants $1,502 on claims for invasion of privacy, receiving stolen property in violation of Penal Code section 496 subdivision (a), and unauthorized access to computer data in violation of Penal Code section 502 subdivision (c). Post-judgment, the trial court awarded Garrabrants (1) costs totaling $65,887.34 as the prevailing party, and (2) attorney fees totaling $1,314,260 pursuant to Penal Code sections 496, subdivision (c) and 502, subdivision (e)(2).

In this consolidated appeal, Erhart seeks complete reversal of the judgment due to (1) purported prejudicial errors of law in the jury instructions, (2) the trial court's refusal to instruct on requested "whistleblower" affirmative defenses, and (3) the court's alleged abuse of discretion in restricting evidence of Erhart's whistleblowing activities. He also requests reversal of the award of costs and attorney fees to Garrabrants.

As to his appeal of the judgment, we conclude Erhart's first argument is meritorious. In our view, the contested special instructions requested by Garrabrants contained erroneous statements of law. First, the trial court erred in instructing the jury that bank customers have an unqualified reasonable expectation of privacy in financial documents disclosed to banks. While California recognizes a constitutional *right to* privacy in financial matters, whether an *expectation of* privacy is reasonable in any given situation is a contextual and fact-specific determination. Second, the trial court erred in instructing the jury that Erhart's whistleblower justification defense depended on proving at least one legally unsupported element.

2

Third, the instructions given for Penal Code section 496 misstated the law by defining "theft" in a manner that essentially renders receiving stolen property a strict liability offense. Fourth, the special instruction on Penal Code section 502 erroneously removed from the jury's consideration the foundational issue of whether Garrabrants "owned" the data about him residing in BofI's computer systems such that he could pursue a civil action under the statute.

In light of the record evidence, we further conclude there is a reasonable possibility a jury could have found in Erhart's favor on each of Garrabrants' claims absent the erroneous instructions, making them prejudicial. We thus reverse the judgment in all respects, including its award of costs and fees to Garrabrants, and remand. We accordingly dismiss as moot Erhart's appeal to the attendant award of costs and fees.

BACKGROUND

I.

At all relevant times, Garrabrants was CEO of BofI. Garrabrants was also a BofI customer.

In September 2013, Erhart joined BofI as a staff auditor. Erhart's direct supervisor was Jonathan Ball.

Ball, together with an audit committee, designed internal audit plans for BofI. Ball assigned Erhart audits to perform from these plans. The audits' purpose was to ensure BofI operated within the regulations governing banks.

To perform his assigned audits, Erhart had access to information in BofI's systems, including customers' confidential financial information. For security reasons, auditors' access was limited to the information needed at

3

any given time to perform their duties and was revoked once an audit was complete.

## II.

Erhart eventually became concerned that BofI was withholding information from its regulators.

In February and March of 2015, Erhart brought home roughly 500 pages of hardcopy BofI documents evidencing "audit findings [he thought] would be concealed from the regulators." Erhart testified that "Ball never said to me directly 'you need to take this information home,'" but he told Erhart "'you need to have your files ready, prepared.'"

The Office of the Comptroller of the Currency (OCC) is the primary regulator of nationally chartered banks like BofI. The OCC conducted onsite examinations of BofI to verify its regulatory compliance.

The morning of March 5, 2015, during one such onsite examination, Garrabrants and Ball conversed in Ball's office. Erhart could not hear the words spoken, but the meeting was "loud." Soon after, Erhart learned that Ball had resigned effective immediately.

Before abruptly leaving, Ball gave another BofI auditor a USB device containing copies of audits, which the auditor gave to Erhart. When he left work that day, Erhart took the USB device and his BofI laptop with him.

The next morning, Erhart informed a coworker he felt unwell and would miss work. The following workday, Erhart informed human resources he was "still not feeling well" and would not return to work until he had met with a doctor to discuss a medical leave of absence. Erhart went on medical leave and never returned to BofI.

4

## III.

Meanwhile, the morning after Ball resigned, Erhart called an OCC whistleblower hotline and told an OCC attorney about Ball's abrupt departure. They arranged to meet the following week, and the OCC attorney requested Erhart bring any physical and electronic files he had.

Before his meeting with the OCC, Erhart e-mailed the documents on the USB device from Ball to the OCC. For security reasons, Erhart's BofI laptop could not download the data, so he used his personal e-mail account and his personal desktop computer to transmit the documents.

Erhart also prepared a summary of discussion points and sent it to the OCC before the meeting. Erhart used either his BofI computer or his then-partner's laptop to create the notes, which contained confidential BofI information, including information concerning Garrabrants.

## IV.

As requested, Erhart brought the hardcopy documents in his possession and his BofI laptop to the OCC meeting. During the meeting, Erhart gave the OCC copies or originals of some of the hardcopy documents he had collected in February and March.

The OCC asked him to download further documents from his BofI laptop to a CD-ROM, but Erhart could not due to the laptop's security measures. Erhart also tried to send the documents from his BofI e-mail address on his BofI laptop but could not. So Erhart accessed his personal e-mail account on his BofI laptop and e-mailed the documents to the OCC. As relevant to this appeal, these documents included several tax-related documents for Garrabrants and his family, several of Garrabrants' Form W-2s, one of Garrabrants' earnings statements, documents pertaining to a trust associated with Garrabrants, Garrabrants' account statements from another

5

financial institution, and several records of copies of checks written on or deposited to accounts belonging to Garrabrants. Erhart obtained those documents from BofI systems and not Garrabrants personally. Erhart took and sent only "the documents that were associated with the issues" he raised with regulators.

After e-mailing the documents to the OCC, Erhart opened his personal e-mail account on his desktop computer and downloaded the documents to a USB device. His desktop lacked the software needed to open and view some of the documents, so he transferred the data from the USB device to his then-partner's laptop. That way, he could view the documents and report BofI's and Garrabrants' alleged wrongdoing to other agencies, including the Securities and Exchange Commission (SEC) and the Internal Revenue Service (IRS). He gave the USB device to his counsel, who reported to the SEC, the IRS, and the Occupational Safety and Health Administration on Erhart's behalf in March or April of 2015.

Erhart retained the documents because he "felt that [he] would be destroying evidence" otherwise. It was "unclear" what he should do with them due to conflicting instructions. According to Erhart, neither BofI nor Garrabrants requested the data's return.

Erhart ultimately gave the hardcopy documents to a digital forensics firm hired by BofI in November 2015. The documents he e-mailed to the OCC, including those about Garrabrants, remained in Erhart's personal e-mail account until roughly November 2021, when his counsel instructed him to delete them. In November 2021, Erhart's desktop computer and a USB device still housed recoverable files of some of the documents, including documents containing Garrabrants' personal data.

6

## V.

Two of the ten to fifteen issues Erhart raised with the OCC concerned Garrabrants. These issues were subsequently reported to the IRS as well.

### A.

First, Erhart reported his suspicion that Garrabrants was not paying income tax on third-party checks he was depositing into his personal account at BofI.

BofI auditors performed quarterly audits of the accounts of randomly selected employees who banked with BofI for "suspicious" activity. Ball added Garrabrants' name to one such audit after Erhart told him that checks payable to two third parties were being deposited into Garrabrants' personal BofI account.

As part of his audit investigation, Erhart looked into Garrabrants' BofI loan file, as he knew it would contain information that would help him assess the legitimacy of the deposits. He reviewed Garrabrants' bank statements from other institutions for similar activity and his tax documents to see if he was paying taxes on the deposits.

### B.

Second, Erhart reported his suspicion that Garrabrants was using a trust to disguise sales of his BofI stock and avoid taxes.

Erhart discovered through an audit that the Steven Garrabrants Freedom-1 Trust (Trust) was "the number-one largest" retail customer account at BofI. Erhart told Ball, who "had no idea" how Steven, Garrabrants' brother and a minor league baseball player, "could possibly have that much money." He asked Erhart to investigate, leading Erhart to pull a transaction history of all BofI accounts that transacted with the Trust's account.

7

Because corporations need to publicly report via SEC filings insider transactions involving stock and "the investing public has a perception" when a CEO sells stock, Erhart believed that Garrabrants was using the Trust to disguise his sales of BofI stock. Essentially, the proper forms were filed to evidence Garrabrants' gift of shares to the Trust, but the Trust then sold the shares without any reporting. Erhart discovered transactions of roughly $300,000 and $100,000 from the Trust's account to Garrabrants' personal account. Erhart believed those transactions were the proceeds from the stock sales; thus, "the stock was not actually a gift."

VI.

In October 2017, Garrabrants initiated the instant action in the Superior Court of San Diego County. He claimed to have first learned Erhart took documents containing his personal information at a December 2015 deposition. In November 2021, four of Garrabrants' claims—for invasion of privacy, intentional infliction of emotional distress (IIED), and violation of Penal Code sections 496 and 502—proceeded to jury trial.

The jury knew that Erhart filed a whistleblower retaliation lawsuit in federal court in 2015 that was still pending at the time of trial. By special verdict, it found Erhart was in good faith involved in whistleblowing activity to which Garrabrants' information was material. Nonetheless, the jury determined that Erhart invaded Garrabrants' privacy and awarded $1,500 in damages. The jury found against Garrabrants on his IIED claim for lack of severe emotional distress. Finally, the jury found Erhart violated both Penal Code sections 496 and 502 and awarded nominal damages of $1 for each claim.

In January 2022, the trial court issued judgment in favor of Garrabrants on the three causes of action on which he prevailed. The court

8

issued injunctive relief under Penal Code section 502 and costs and attorney fees under Penal Code sections 496 and 502 in an amount to be determined by post-judgment motion.

In June 2022, Garrabrants, as the prevailing party, was awarded costs totaling $65,887.34. And in August 2022, Garrabrants was awarded attorney fees totaling $1,314,260 pursuant to Penal Code sections 496 and 502.

## ANALYSIS

We first turn to Erhart's alleged instructional errors.

## I.

We review purported instructional errors de novo. (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 831.) Where error exists, "we must determine whether it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error." (*Weiner v. Fleischman* (1991) 54 Cal.3d 476, 490.) This assessment is context specific, requiring us to look at the evidence and other instructions. (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 876 (*LeMons*).) Among the factors we may consider are "the degree of conflict in the evidence on critical issues," the closeness of the verdict, "the effect of other instructions in remedying the error," the emphasis given the error in argument, and whether the jury requested the instruction or related evidence be reread. (*Ibid.*)

We generally presume the correctness of the trial court's judgment on appeal. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) Appellate review of any prejudice resulting from instructional errors, however, is deferential to the appellant. (*Morales v. 22nd Dist. Agricultural Assn.* (2016) 1 Cal.App.5th 504, 525.) In such circumstances, "we must view the evidence in the light most favorable to the losing party" and "must assume the jury might have

believed the evidence upon which the proposed instruction was predicated and might have rendered a verdict in favor of the losing party had a proper instruction been given." (*Bourgi v. West Covina Motors, Inc.* (2008) 166 Cal.App.4th 1649, 1664.)

## II.

As an initial matter, Garrabrants argues Erhart forfeited most of his asserted instructional errors by failing to (1) raise them at trial or (2) adequately support his claims on appeal with citations to authority or the record. In response, Erhart urges (1) the alleged instructional errors presented incorrect statements of law, and thus are preserved for appeal regardless of objection; and (2) his opening brief complies with relevant appellate rules and procedure. We agree with Erhart on both counts.

Subject to exceptions not relevant here, if a jury instruction contains "an incorrect statement of law, the party harmed by that instruction need not have objected to the instruction or proposed a correct instruction of his [or her] own in order to preserve the right to complain of the erroneous instruction on appeal." (*Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9.) Accordingly, to the extent Erhart contends the given instructions were legally unsound, we conclude he did not forfeit these claims, at least as to the arguments addressed in this opinion. Further, Erhart's opening brief is adequately supported by citations to the record and legal authority; thus, we conclude his arguments on appeal are not forfeited on these grounds. (Cf. *Central Valley Gas Storage, LLC v. Southam* (2017) 11 Cal.App.5th 686, 694.)

Accordingly, we turn to the merits of Erhart's asserted instructional errors.

10

### III.

Erhart argues the trial court's instructions on invasion of privacy were prejudicially erroneous. We agree.

### A.

Any state constitutional invasion of privacy claim, including a claim for intrusion into private affairs, includes three elements: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 39-40 (*Hill*).)

As relevant here, the Judicial Council of California's model instruction on claims for invasion of privacy provides that, to prevail, a plaintiff must prove "[t]hat [*name of plaintiff*] had a reasonable expectation of privacy in [*specify place or other circumstance*]." (CACI 1800.) It further states:

> In deciding whether [*name of plaintiff*] had a reasonable expectation of privacy in [*specify place or other circumstance*], you should consider, among other factors, the following:
>
> (a) The identity of [*name of defendant*];
>
> (b) The extent to which other persons had access to [*specify place or other circumstance*] and could see or hear [*name of plaintiff*]; and
>
> (c) The means by which the intrusion occurred.

(*Ibid.*) Justification due to a countervailing interest is an affirmative defense. (*Hill, supra*, 7 Cal.4th at p. 38.)

11

B.

Although Erhart proposed the standard CACI instruction for invasion of privacy, the trial court instead instructed the jury with a modified version of CACI 1800 requested by Garrabrants. As relevant here, the modified instruction departed from the standard in specifying in its introductory paragraph the ways in which Erhart purportedly violated Garrabrants' right to privacy. The given instruction did, however, include the standard factors the jury should consider in deciding if Garrabrants had a reasonable expectation of privacy in the at-issue data.

At Garrabrants' request and over Erhart's objection, the trial court followed the modified CACI 1800 instruction with Special Instruction No. 1: "Bank customers have a reasonable expectation of privacy with respect to financial information disclosed to their bank."

During closing argument, Garrabrants' counsel stressed the indisputability of Garrabrants' expectation of privacy when walking the jury through the special verdict form, saying this element was "an easy 'yes,' and I don't even think that the other side will argue the point." Indeed, initially, the other side did *not* argue the point, saying, "[n]o dispute there." Later, however, Erhart's counsel clarified that she did not believe Garrabrants had a reasonable expectation of privacy given the OCC and internal auditors had access to the information.

As to this issue, the special verdict form stated: "Did Mr. Garrabrants have a reasonable expectation of privacy in his confidential or financial information held in BofI Federal Bank files?" The jury checked "Yes."

The court also instructed the jury using CACI 1807 on justification based on whistleblowing as an affirmative defense. At Garrabrants' insistence and over Erhart's objection, the trial court followed that

12

instruction with Special Instruction No. 6, which set forth six elements Erhart had to prove to establish he was involved in "whistleblowing activity." As relevant here, the elements included that Erhart "reasonably believed that it was necessary to remove [the data] because it would have been lost or destroyed had he not done so."

The special verdict form asked the jury to decide whether Erhart was, "in good faith, involved in a whistleblowing activity for which Mr. Garrabrants' confidential or financial information was material." The jury checked "Yes."

## C.

Erhart identifies numerous alleged errors in the trial court's instructions on invasion of privacy. We conclude Erhart's argument that Special Instruction No. 1's erroneous statement that bank customers have an unconditional expectation of privacy in the financial information they provide to banks is dispositive.

### 1.

Erhart contends that a bank customer's expectation of privacy in financial information provided to a bank is "*not absolute*," yet Special Instruction No. 1 "effectively dictated that the jury find for Garrabrants on the first element" of this claim. Garrabrants counters that "[b]ank customers unquestionably have a reasonable expectation of privacy in their financial affairs and the information that they provide to banks" and that the special instruction's language "was taken almost verbatim from *Valley Bank*[ *of Nev. v. Superior Court* (1975) 15 Cal.3d 652 (*Valley Bank*)]."

In offering Special Instruction No. 1 at trial, Garrabrants cited *Valley Bank, Burrows v. Superior Court* (1974) 13 Cal.3d 238 (*Burrows*), and *Fortunato v. Superior Court* (2003) 114 Cal.App.4th 475 (*Fortunato*).

13

In *Burrows*, where a petitioner under investigation for misappropriating client funds sought to suppress financial records obtained from his bank without a warrant, our Supreme Court held that "[a] bank customer's reasonable expectation is that, absent compulsion by legal process, the matters he reveals to the bank will be utilized by the bank only for internal banking purposes." (*Burrows*, at p. 243.)  In *Valley Bank*, where a bank disputed a discovery order compelling it to turn over third-party financial statements in a legal proceeding, the court of appeal recognized "the right of bank customers to maintain reasonable privacy regarding their financial affairs." (*Valley Bank*, *supra*, 15 Cal.3d at p. 657.)  And in *Fortunato*, a probate matter where the possible waiver of the tax-return privilege was at issue, the court of appeal stated that "there is a right to privacy in confidential customer information *whatever* form it takes, whether that form be tax returns, checks, statements, or other account information." (*Fortunato*, at p. 481.)  Garrabrants again contends that each of these cases supports Special Instruction No. 1.

However, we agree with Erhart that, while these cases stand for the proposition that a bank customer has a constitutionally protected *right to* privacy in financial information provided to a financial institution for banking purposes, that right does not translate into an unqualified *reasonable expectation of* privacy in that information in all circumstances. As our Supreme Court recognized in *Hill*, the foundational case on claims for invasion of privacy, "[e]ven when a legally cognizable privacy interest is present, other factors may affect a person's reasonable expectation of privacy." (*Hill*, *supra*, 7 Cal.4th at p. 36.)  Whether an expectation of privacy is reasonable in any given circumstance is a context-specific inquiry, and "'[t]he protection afforded to the plaintiff's interest in his [or her] privacy

14

must be relative to the customs of the time and place, to the occupation of the plaintiff[,] and to the habits of his [or her] neighbors and fellow citizens." (*Id.* at pp. 36-37 (quoting Rest.2d Torts, § 652D, com. c).) *Burrows*, cited by Garrabrants, recognizes as much in identifying "compulsion by legal process" as a factor potentially affecting the expectation of privacy. (*Burrows*, *supra*, 13 Cal.3d. at p. 243.) Ultimately, "whether a legally recognized privacy interest exists is a question of law, and whether the circumstances give rise to a reasonable expectation of privacy and a serious invasion thereof are mixed questions of law and fact." (*Pioneer Electronics (USA), Inc. v. Superior Court* (2007) 40 Cal.4th 360, 370.)

Here, Special Instruction No. 1 invaded the province of the jury by removing from its consideration whether, in the factual context of this particular dispute, Garrabrants had a reasonable expectation that his financial documents would remain private. Instead, the instruction effectively informed the jury that this element was satisfied regardless of context. That the instruction was "taken almost verbatim from *Valley Bank*" does not alter our conclusion. Indeed, "it is dangerous to frame an instruction upon isolated extracts from the opinions of the court," as "'[j]udicial opinions are not written as jury instructions and are notoriously unreliable as such.'" (*Francis v. San Francisco* (1955) 44 Cal.2d 335, 341; *Merritt v. Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 876, fn. 5 [quoting 1 Stanbury, Cal. Trial and Appellate Practice, § 630, p. 695].)

Accordingly, we conclude Special Instruction No. 1 was erroneous as a matter of law.

2.

We further determine the instructional error prejudiced Erhart. (See *LeMons*, *supra*, 21 Cal.3d at p. 876.) The error was not remedied by other

15

instructions.  While the modified version of CACI 1800 given to the jury set forth factors to consider when deciding whether Garrabrants had a reasonable expectation of privacy in the at-issue information, Special Instruction No. 1, which immediately followed, informed jurors that bank customers *have* a reasonable expectation of privacy in such information. "[W]here two instructions are inconsistent, the more specific charge controls the general charge." (*LeMons*, *supra*, 21 Cal.3d at p. 878.)  Thus, as the evidence that Garrabrants was a bank customer was undisputed, it is reasonably likely the jury concluded based on Special Instruction No. 1 that Garrabrants had a reasonable expectation of privacy here.  Garrabrants' counsel compounded the error in emphasizing this point in closing argument.

Meanwhile, based on our review of the record, it is reasonably probable that the jury would have reached a result more favorable to Erhart absent the mis-instruction.  While Garrabrants was a BofI customer, he was also BofI's CEO.  BofI employees' accounts were subject to audits to ensure their activities were legal.  Erhart was an internal auditor at BofI.  His job included accessing confidential financial information, including that of BofI customers and employees.  When Erhart raised questions concerning the legality of Garrabrants' transactions at BofI, his supervisor asked him to investigate further.  A jury reasonably could have concluded from this evidence that (1) Garrabrants, being not just a customer but also the CEO of BofI, did not have a reasonable expectation that his financial and confidential information in BofI's possession would be private; and, accordingly, (2) Erhart did not invade Garrabrants' privacy.  (See *Hill*, *supra*, 7 Cal.4th at p. 40 ["A defendant may prevail in a state constitutional privacy case by negating any of the three elements."].)  Thus, the error prejudiced Erhart.

16

Accordingly, we reverse the judgment in favor of Garrabrants on his claim for invasion of privacy. Given our determination, we need not reach the remaining alleged errors Erhart identifies.

D.

As the issue is likely to resurface in any retrial following remand, however, we briefly address Erhart's argument that Special Instruction No. 6 contained prejudicially erroneous elements unsupported by the law. Because the jury found Erhart was in good faith involved in whistleblowing activity, there was no prejudice here. Nonetheless, we agree that Special Instruction No. 6 includes *at least* one element—namely, that Erhart needed to believe the documents may have been lost or destroyed had he not removed them—that has no readily apparent basis in California law, therefore making the instruction erroneous as a matter of law. (See Lab. Code, § 1102.5, subds. (a) & (b); CACI 4603.)

Garrabrants purportedly drew this requirement from an order in the related whistleblower action pending in federal court as well as *JDS Uniphase Corp. v. Jennings* (E.D. Va. 2007) 473 F.Supp.2d 697 (*JDS*). However, as Erhart notes, neither case concerned a whistleblower justification defense to a California invasion of privacy claim. (See *Erhart v. BofI Holding, Inc.* (S.D. Cal., Feb. 14, 2017, No. 15-CV-02287-BAS-NLS) 2017 WL 588390, at p. *3 (*Erhart*); *JDS*, at p. 698.) Further, the order in the whistleblower action concerned affirmative defenses premised on "whistleblower protections under federal and state law," including at least five federal anti-retaliation provisions not relevant here. (*Erhart*, at pp. *1, *5, fn. 3.) Indeed, the specific portion of the order on which Garrabrants relies concerns the Sarbanes-Oxley Act's (SOX) whistleblower protection provision. (*Id.* at pp. *13-15.) Similarly, *JDS* is premised on SOX's

17

antiretaliatory provision and California's pro-whistleblower public policy generally, rather than what California's whistleblower protection statutes necessitate for whistleblower protection. (See *JDS*, at pp. 702-703; see also Lab. Code, § 1102.5, subds. (a) & (b); CACI 4603.)

We thus once more caution against proposing language drawn from potentially inapposite case law as jury instructions, particularly where, as here, an elements test never articulated previously is cobbled together from multiple cases. (See *Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718.)

## IV.

Erhart additionally argues that the trial court's instructions on Garrabrants' Penal Code section 496 claim were prejudicially erroneous. We again agree.

### A.

Penal Code section 496 criminalizes the "buy[ing] or recei[pt of] any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained," as well as the concealing or withholding of "any property from the owner, knowing the property to be so stolen or obtained." (Pen. Code, § 496, subd. (a).) A person injured under this subdivision can bring an action for treble damages and attorney fees. (*Id.*, subd. (c).)

### B.

The trial court largely adopted and gave two special instructions proposed by Garrabrants and rejected the special instruction proposed by Erhart on Penal Code section 496.

As relevant here, Special Instruction No. 2, on receiving stolen property in violation of section 496, required Garrabrants to prove that the data at

18

issue "had been obtained by Mr. Erhart in a manner constituting theft as defined elsewhere in these instructions." Garrabrants purportedly modeled this instruction on both Penal Code section 496 and CALCRIM No. 1750, the pattern criminal jury instruction on section 496. Erhart's rejected competing special instruction specified that the property in question must have been "stolen or obtained in a manner constituting theft or extortion," but did not further define "theft."

Garrabrants, however, proposed, and the court instructed the jury on, Special Instruction No. 3, which defined "theft" for purposes of the claim as follows:

> Mr. Erhart committed theft if he took possession of Mr. Garrabrants' confidential or financial information without Mr. Garrabrants' consent, or if he fraudulently obtained or appropriated Mr. Garrabrants' confidential or financial information entrusted to him as an employee of BofI Federal Bank. A person fraudulently obtains or appropriates confidential or financial information if he or she: (a) obtains the information by false pretenses; or (b) obtains the information by breaching a duty, trust or confidence.

Garrabrants purportedly based this special instruction on Penal Code section 484, subdivision (a), which defines theft, and the pattern instruction for larceny. When discussing jury instructions with the court, Garrabrants' counsel also claimed the proposed instruction contained "the definition of fraud from the CALCRIM [instructions for theft by embezzlement and false pretense]."

The relevant portion of the special verdict form simply stated: "Did Mr. Erhart obtain Mr. Garrabrants' confidential or financial information in a manner constituting theft?" The jury checked "Yes."

19

C.

Erhart challenges the soundness of the trial court's instructions on Penal Code section 496 on several grounds. We reach only Erhart's arguments that (1) the given instructions failed to instruct on "the essential element of criminal intent" and (2) Special Instruction No. 3 erroneously defined "theft," as those contentions are dispositive.

1.

We conclude Special Instructions Nos. 2 and 3 misstated the law and thus misled the jury as to what "obtained in any manner constituting theft" means for purposes of violating Penal Code section 496. (Pen. Code § 496, subd. (a).)

As relevant here, the Penal Code provides that persons are guilty of theft if they (1) "feloniously steal[ or] take . . . the personal property of another" or (2) "fraudulently appropriate property which has been entrusted to [them]." (Pen. Code § 484, subd. (a).) The first of these definitions describes theft by larceny. (*People v. Myles* (2023) 89 Cal.App.5th 711, 729, fn. 8 (*Myles*).) The second defines embezzlement. (Pen. Code, § 503.)

The first sentence of Special Instruction No. 3 seemingly intended to encompass these two types of theft. Special Instruction No. 3, however, erroneously defined larceny. Importantly, larceny requires an "intent to steal"—in other words, "the intent, without a good faith claim of right, to permanently deprive the owner of possession." (*People v. Davis* (1998) 19 Cal.4th 301, 305.) A jury instruction defining theft by larceny without the requisite specific intent is erroneous as a matter of law. (*Myles*, *supra*, 89 Cal.App.5th at p. 732.) For example, in *Myles*, the trial court erred when it properly instructed the jury with the four elements set out in the pattern instruction for theft, CALCRIM No. 1800—including the third element on

20

specific intent—but added a sentence requested by the prosecution that stated: "'The *unauthorized* use of utilities in a residence or consumption of property within the home is considered larceny for purposes of Burglary.'" (*Myles*, at pp. 730-731.) That addition rendered the instruction erroneous because "nothing in this description of the offense of theft conveyed that the defendant had to act with the specific intent to permanently deprive the owner of the utilities used, or the property consumed. By leaving out any description of the defendant's mental state, the modification effectively turned theft into a strict liability offense." (*Id.* at p. 731.)

Here, too, the instruction "gave the jury a truncated definition of theft that left out the required specific intent." (*Myles*, *supra*, 89 Cal.App.5th at p. 732.) But unlike the instruction in *Myles*, an accurate recitation of the elements of the offense elsewhere in the charge was lacking. (*Id.* at p. 730.) Accordingly, the instruction on theft here was more fatally deficient in instructing the jury on the requisite intent element. (*Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal.5th 333, 361-362.)

"[W]here the jury is permitted to choose between two factual theories, is misinstructed as to the legal requisites for one of them, and there is no way to eliminate the likelihood that the jury chose the theory affected by the instructional error," it is likely the jury reached an improper verdict and reversal is required. (*Lundy v. Ford Motor Co.* (2001) 87 Cal.App.4th 472, 480.) Although Special Instruction No. 3 provided an alternate definition of theft by way of embezzlement, we are unable to surmise from the record, which conceivably contained adequate evidence to support either theory, whether or to what extent the jury based its decision on the alternate theory given the special verdict form's generality on the manner of theft. Because we conclude that one of the two definitions of theft underlying the jury's

finding was an incorrect statement of law that vitiated Penal Code section 496's requirement of criminal intent and we cannot discern which definition the jury relied on, it is likely that the jury relied on the erroneous instruction in reaching its verdict. (*Lundy*, at p. 480.) We therefore need not assess the legal soundness of the alternate definition.

We do, however, briefly address several additional arguments raised by Garrabrants. First, Garrabrants contends that Erhart's challenge to the Penal Code section 496 instructions is "largely a sufficiency of the evidence challenge." Erhart does devote portions of his argument to the sufficiency of the evidence for certain elements—for example, Garrabrants' property interest—without always identifying a corresponding instructional defect. Nonetheless, Erhart unambiguously challenges the given instructions' failure to instruct on the necessary element of intent. Garrabrants' argument is accordingly inapplicable to the instant issue.

Second, Garrabrants argues that Erhart's proposed instruction on Penal Code section 496 "w[as] not substantively different from the trial court's instruction[ ]," and suggests that Erhart cannot complain of error in instructions he himself requested. But Erhart's proposed instruction did not erroneously define "theft"; rather, as Garrabrants admits, "Erhart did not propose a theft instruction." We thus reject any contention Erhart invited or acquiesced to the given instructions' legal error.

2.

We also determine this error was prejudicial. (*See LeMons, supra*, 21 Cal.3d at p. 876.) Had the jury found that Erhart lacked an intent to steal, the jury could not have found that Garrabrants proved Erhart obtained his information in a manner constituting larceny. Here, no other instructions

22

remedied the error, and the evidence was such that a reasonable jury, properly instructed, could have decided this issue more favorably to Erhart.

There was evidence before the jury that Erhart had been authorized by Ball to further investigate both the third-party checks deposited into Garrabrants' account and the Trust's account activity. One auditor testified BofI auditors had access only to information necessary to the scope of any current audits. Erhart testified that he accessed Garrabrants' personal financial information to enable him to complete the two audits assigned to him. Erhart was concerned about possible illegal activity at BofI, including that of Garrabrants. Erhart testified that his supervisor had told him to "'have [his] files ready, prepared.'" Erhart believed he was acting as a whistleblower at the time he took the documents in question and provided them to regulatory agencies. He also thought he would be destroying evidence if he got rid of the data, so Erhart retained it. Based on this evidence, a reasonable jury could have found that Erhart had a good-faith claim of right to the information, and thus lacked the necessary intent to steal it for theft by larceny.

Moreover, a jury reasonably could have found on this record that Erhart also did not obtain the information in *any other* relevant manner constituting theft. Embezzlement, "a form of larceny," similarly requires an intent to deprive an owner of his or her property. (*People v. Casas* (2010) 184 Cal.App.4th 1242, 1246.) A good-faith belief that one is authorized to take the property in question is a defense to liability. (*People v. Stewart* (1976) 16 Cal.3d 133, 139; Pen. Code § 511; CALCRIM No. 1863.) For the reasons provided above, a reasonable jury could have found Erhart lacked the requisite intent and believed in good faith he was authorized to take and retain the information in question. Theft by false pretenses, meanwhile,

23

"involves the *consensual* transfer of possession as well as *title* of property."
(*People v. Williams* (2013) 57 Cal.4th 776, 788.)  Because Garrabrants
claimed to have not known that Erhart took the documents until December
2015 and subsequently sued Erhart for his actions, a reasonable jury could
have found Garrabrants did not consent to Erhart's taking of the documents
as needed to prove theft by false pretenses.  And we question whether it is
even possible to transfer title to the "property" at issue.

Given a reasonable jury could have found that Erhart did not obtain
Garrabrants' information in any manner constituting theft, there was "a
*reasonable chance*, more than an *abstract probability*," that the error affected
the verdict.  (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704,
715.)  We accordingly must reverse the judgment in Garrabrants' favor on
this claim.  In light of our determination, we need not reach the remaining
alleged errors Erhart identifies for this claim.

V.

Erhart further contends the trial court's Penal Code section 502
instruction was prejudicially erroneous.  Once more, we agree.

A.

Under Penal Code section 502, a person "is guilty of a public offense" if
he or she "[k]nowingly accesses and without permission takes, copies, or
makes use of any data from a computer, computer system, or computer
network."  (Pen. Code § 502, subd. (c)(2).)  The statute authorizes "the owner
or lessee of the . . . data who suffers damage or loss by reason of a violation of
[the statute]" to bring a civil suit.  (*Id.*, subd. (e)(1).)

There are limited exceptions to liability for certain "acts which are
committed by a person within the scope of lawful employment" and even

24

specified acts committed outside the scope of lawful employment.  (Pen. Code § 502, subds. (h)(1)-(2), (i).)

B.

As relevant to this appeal, CACI 1812, the pattern instruction on Penal Code section 502, provides that one element a plaintiff must prove to prevail on such a claim is "that the plaintiff is the owner or lessee of" the technology or data accessed.  (CACI 1812.)

Neither party, however, requested the CACI instruction.  Rather, the trial court gave Special Instruction No. 4, which, as relevant here, required Garrabrants to prove "[t]hat Mr. Erhart knowingly accessed and without permission took, copied and/or otherwise made use of Mr. Garrabrants' confidential or financial information from a BofI Federal Bank computer, computer system[,] or computer network."  This instruction was substantively identical to Garrabrants' proposed instruction.

Meanwhile, the trial court rejected Erhart's proposed instruction, which, among other differences, included the following element:  "Mr. Erhart knowingly accessed and altered, damaged, deleted, destroyed, or otherwise used any data, computer, computer system, or computer network owned or leased by Mr. Garrabrants."

On this issue, the special verdict form asked if Erhart accessed and took, copied, or used "Garrabrants' confidential or financial information," without reference to who owned the technology or data accessed.  The jury checked "Yes."

C.

Erhart contends the instruction on Penal Code section 502 was prejudicially erroneous for many reasons.  We conclude Erhart's argument that the instruction failed to require the jury to decide whether Garrabrants

25

owned the at-issue data such that he had standing to bring his claim is meritorious.

1.

We agree with Erhart that the given instruction was erroneous as a matter of law on the issue of ownership. Erhart contends "[t]he jury was never asked whether Garrabrants owned the documents at issue—he did not, [BofI] did." Because Garrabrants did not own the data at issue, Erhart argues Garrabrants did not have standing to bring a private action under Penal Code section 502. According to Erhart, a properly instructed jury thus could not have found in Garrabrants' favor. Garrabrants counters that "the first element of the trial court's instruction required that Garrabrants be the owner of the confidential information." He further argues "[v]arious courts have held that individuals who store their personal and confidential 'data' with third-parties have an ownership interest in the data for purposes of" a section 502 claim.

As the parties implicitly recognize in their briefing, the concept of "ownership" has particular meaning in the law. The Civil Code defines "ownership" as "the right of one or more persons to possess and use [a thing] to the exclusion of others." (Civ. Code, § 654.) Black's Law Dictionary similarly defines an "owner" as "[s]omeone who has the right to possess, use, and convey something; a person in whom one or more interests are vested." (Black's Law Dictionary (11th ed. 2019).) It notes "[a]n owner may have complete property in the thing or may have parted with some interests in it." (*Ibid.*) Ultimately, "[o]wnership is a question of fact to be determined by a jury under appropriate instructions of law." (*Kaley v. Catalina Yachts* (1986) 187 Cal.App.3d 1187, 1198.)

26

Even accepting Garrabrants' contention that the instruction implicitly requires the jury to decide whether, rather than assumes, the data Erhart accessed and took, copied, or used was "Garrabrants' confidential or financial information," it fails to instruct that Garrabrants' interest in the data at issue must be an *ownership* interest. The jury could have understood the instruction in that way. However, a reasonable jury also could have construed the instruction as simply asking whether Erhart took, copied, or used confidential or financial information *concerning* Garrabrants but belonging to someone else—for example, BofI. Alternatively, a reasonable jury could have understood the instruction to ask whether Erhart's actions concerned data in which Garrabrants had *some form* of interest—for example, a privacy interest, as in Garrabrants' first claim—but not necessarily an *ownership* interest. Thus, as instructed, the jury was not required to decide the foundational and necessary question of whether Garrabrants actually "owned" the data at issue as needed for him to pursue relief against Erhart at all.

Garrabrants cites several cases for the broad proposition that an individual who stores his or her personal and confidential data with a third party has an ownership interest in that data for purposes of a private right of action under Penal Code section 502. One case on which he relies is *In re Zoom Video Communs. Privacy Litig.* (N.D. Cal. 2021) 525 F.Supp.3d 1017 (*In re Zoom*). *In re Zoom*, however, is inapposite. There, the district court merely decided on a motion to dismiss that most of the plaintiffs had failed to adequately allege that any of "their data" had been shared with any third parties in violation of their constitutional right to privacy. (*Id.* at pp. 1036-1038.) It then found, as a result, that the plaintiffs had failed to adequately allege the damage or loss required to state a cause of action under Penal

Code section 502. (*Id.* at p. 1044.) The parties did not raise, and the court did not address, whether the plaintiffs were the legal "owners" of the data in question who had a right to bring a civil action in the first place.

Garrabrants also relies on *Lindsay-Stern v. Garamszegi* (C.D. Cal., Oct. 13, 2016, No. SACV1401970CJCDFMX) 2016 WL 11745948 (*Lindsay-Stern*), which fails to support his position, too. *Lindsay-Stern* involved a lawsuit brought by the employee of a company against a former employee of the same company who had hacked her work e-mail account over several years. (*Id.* at pp. *1-3.) The plaintiff argued at summary judgment that her Penal Code section 502 claim should proceed because she had an ownership interest in certain data contained in her e-mails during the relevant period. (*Id.* at p. *5.) The district court agreed, finding the plaintiff had "demonstrated some ownership interest in at least some of the data transmitted through her email account." (*Ibid.*) But even the language Garrabrants cites from *Lindsay-Stern* makes clear this holding is not universal, as it merely states that "[i]ndividuals *can* have an ownership interest in the data within their emails even if the emails are not themselves owned by the individual." (*Ibid.*, italics added.)

Whether Garrabrants owned the data in Erhart's possession was a question of fact for the jury to decide. By assuming or asking whether Garrabrants had an *unspecified* interest in the data in question, the instruction as given removed from the jury's consideration an element that Garrabrants had to prove to prevail on his claim. Therefore, the instruction was erroneous as a matter of law.

### 2.

This error prejudiced Erhart. (*See LeMons*, *supra*, 21 Cal.3d at p. 876.) Had the jury found Garrabrants did not "own" the data in question,

28

Garrabrants could not have prevailed on his claim.  As with the Penal Code section 496 instructions, no other instructions remedied this error, and the evidence was such that a reasonable jury, properly instructed, could have decided this issue more favorably to Erhart.

There was evidence before the jury that Erhart obtained the data in question from BofI and not Garrabrants directly.  Thus, there was evidence in the record from which the jury could have found that BofI, not Garrabrants, possessed the data, and that BofI employees and auditors had the right to use that data for BofI's business, including during quarterly audits of employees' accounts.  Meanwhile, the trial record was devoid of evidence showing Garrabrants' continued ability to use, possess, or otherwise control this data in BofI's possession—for example, customer terms of service Garrabrants may have signed evidencing a continued ownership interest in the records.  On this record, a reasonable jury could have concluded that BofI, not Garrabrants, was the "owner" of the data in question, and accordingly could have decided in favor of Erhart.  (See *United States v. Miller* (1976) 425 U.S. 435, 440 [finding respondent seeking to suppress financial records subpoenaed from banks in tax fraud trial could "assert neither ownership nor possession" of the documents, which were not his "'private papers'" but rather "the business records of the banks"].)

We therefore reverse the judgment in Garrabrants' favor on this claim. In light of our determination, we need not reach the remaining alleged errors Erhart identifies.

\*   \*   \*

The instructional errors here were understandable, given (1) many involved statements of law for which no fully applicable pattern instruction was available and (2) the paucity of civil case law on the statutory claims.

Nonetheless, we determine one or more of the jury instructions on each of the challenged claims was prejudicially erroneous, thus requiring reversal of the judgment in its entirety. We therefore need not address Erhart's contention that the trial court abused its discretion in excluding some of the evidence of Erhart's whistleblowing activity. We also need not address the trial court's refusal to instruct on Erhart's requested affirmative defenses to the statutory claims.

Furthermore, as our decision necessarily reverses the costs and attorney fees Garrabrants was awarded post-judgment as the prevailing party, we dismiss as moot Erhart's appeal challenging the award of costs and fees. (See *Bevis v. Terrace View Partners, LP* (2019) 33 Cal.App.5th 230, 263 ["Our reversal of the judgment also necessarily compels the reversal of the award of attorney fees and costs to plaintiffs based on the judgment."].)

Finally, as this opinion does not rely on the materials Erhart requests we judicially notice in either appeal, we deny as moot those requests.

This disposition absolves us of the need to decide difficult questions implicating important matters of public policy. We neither take nor express any position on the merits of the claims underlying this appeal. We note, however, that the nature of this case raises the question of whether existing law adequately protects purported whistleblowers from the myriad ways in which retaliation may present itself. Here, we have litigation brought by an executive officer of an entity in his individual capacity against a whistleblower while a whistleblower retaliation lawsuit was pending against the entity. The claims asserted here may be at odds with evidentiary obligations arising in the litigation between the whistleblower and entity, such as the duty to preserve evidence during and even prior to litigation and

30

court-issued protective or discovery orders.  Although we raise this question, luckily for us, it is one for the Legislature, and not the courts, to resolve.

CONCLUSION

For the foregoing reasons, we reverse the judgment in favor of Garrabrants in all respects, including the award of costs and attorney fees, and remand this action.  Should Garrabrants prevail on retrial, the trial court will need to take into consideration the outcome of this appeal in assessing the appropriate amount of attorney fees.  (See *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989-990 [degree of success a factor in fee calculation].)  Garrabrants shall bear Erhart's costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


CASTILLO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


KELETY, J.

31

Filed 12/29/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GREGORY GARRABRANTS,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CHARLES MATTHEW ERHART,<br><br>  Defendant and Appellant. | D080136, D081154<br><br><br>  (Super. Ct. No. 37-2017-00039440-CU-NP-CTL )<br><br><br>ORDER CERTIFYING OPINION<br>  FOR PUBLICATION |

THE COURT:

The opinion in this case filed December 18, 2023, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

HUFFMAN, Acting P. J.

Copies to:  All parties